Peele, J.,
delivered the opinion of the court:
The claim in this case, based on awards of certificates of allowances made by the Commissioner of Internal Revenue for the repayment of special tax, as hereinafter stated, was trans: mitted to the court by the Secretary of the Treasury, at the request of the Comptroller thereof, under Revised Statutes, section 1063, as a claim, “involving controverted questions of law,” the decision of which the Secretary says “will furnish a precedent for the future action of the accounting officers in the adjustment of a class of cases.”
The claim, based on the award so made, is one which the Department evidently had the jurisdiction to pay. It is also *462 one “which by reason of the subject-matter and character the court might under existing laws take jurisdiction of o'n the voluntary action of the claimant,” and we will therefore proceed to examine into and adjudicate the claim.
The special tax was paid by the claimant under the following circumstances:
Under Post Exchange Regulations, adopted by the War Department and published by General Orders, No. 46, Headquarters of the Army, July 25, 1895, post exchanges were established and the commanders at every post thereby required to institute the same; to set apart, rent, or construct as therein provided a suitable building or rooms therefor and to detail an officer, to be designated as “officer in charge,” to manage the business and affairs of such exchanges under the superintendence of a council consisting of three officers.
The purpose of such exchanges, as defined in paragraph 1 of said regulation, is as follows:
“The post exchange will combine the features of reading and recreation rooms, a cooperative store, and a restaurant. Its primary purpose is to supply the troops at reasonable prices with the articles of ordinary use, wear, and consumption not supplied by the Government, and to afford them means of rational recreation and amusement. Its secondary purpose is, through exchange profits, to provide the means for improving the messes.”
Such exchanges were first organized under General Order, No. 10, Adjutant-General’s Office, February 1, 1889, and as thus organized superseded the “canteens,” which were organizations in the nature of social clubs, voluntarily formed by the officers of a regiment or other command with their own money and conducted independently of their official duties, as we are advised.
These social clubs, known as “canteens,” were organized after the office of sutler in the Army had been abolished by act of July 28,1866 (14 Stat. L., 366). They were held liable to internal-revenue tax the same as social clubs in cities selling manufactured tobacco, cigars, and liquors to their members.
By the act of January 28, 1893 (27 Stat. L., 426; 2 Supp. Rev. Stat., 76), post traderships in connection with the military service were also abolished, and following this came the establishment of “post exchanges” by the regulations therefor, published in 1895, as aforesaid.
*463 It was under and pursuant to the regulations aforesaid that the claimant, first lieutenant, Third Cavalry, United States Army, was detailed as “officer in charge” of the “post exchange” at Jefferson Barracks, Mo., and required to manage the business affairs of said exchange.
The membership of such exchanges, under paragraph 19 of said regulations, consists of “organizations, companies, and detachments,” each of which, on the institution of an exchange, contributes such sum from their company fund as the exchange council may assess against them, being their respective “ proportionate part of the expense attending the fitting up and stocking the establishment.”
In the Army the ration or “allowance for subsistence” is ordinarily issued to the immediate commanders of organizations, under the requirement of the War Department, as by so doing the commanding officers are thereby enabled to form a mess or common table for all the members of such organizations.
The funds or capital upon which exchanges are conducted are in a sense supplied by the Government; i. e., by reason of uniting the rations due such organizations into one mess or common table, a percentage more or less of such rations is not needed by them for consumption, and such surplus so arising is by authority of the act March 3, 1875 (18 Stat. L., 402; 1 Supp. Rev. Stat., 77), and as provided by paragraph 1269, Army Regulations, 1895, sold to the Commissary Department, if required for reissue, at invoice prices, and if not so required “ may be sold to any person,” thereby creating a fund with which to conduct such exchanges, whereby a variety of articles for use, wear, and consumption, not furnished by the Government, are provided for the membership of such exchanges, and that at the same time the exchange is supplied with reading rooms, reading matter, billiard and pool tables, cigars and tobacco, and such sports as the officers in command may deem conducive to the health, comfort, and discipline of their commands.
Thus the unused or surplus portions of the united rations so accumulated are exchanged, by way of sale and purchase, for other articles more needed and desired, and, too, without expense to the Government or any money outlay by the members of such organizations or exchanges.
The Regulations also provide, in paragraph 10 thereof, that *464 “on the recommendation of the exchange council the commanding officer may permit beer and light wines to be sold at the canteen (a separate room or apartment in the post exchange) by the drink whenever he is satisfied that giving to the troops the opportunity of obtaining such beverage within the post limits will prevent them from resorting for strong intoxicants to places without such limits, and tends to promote temperance and discipline among them,”
It was for selling such articles under the permit and authority of the War Department, made known through the regulations aforesaid, that the collector of internal revenue for the first district of Missouri, in which district the post exchange at Jefferson Barracks was located, required the claimant, as officer in charge of the exchange, to pay the special tax as a “ retail liquor dealer ” for each of the fiscal years ending June 30, 1896 and 1897.
On the application of the claimant, therefore, the Commissioner of Internal Be venue, under Bevised Statutes, section 3426, as amended by section 17 of the act of March 1,1879 (20 Stat. L., x). 349 j lSupp. Bev. Stat., p. 241), made allowances or awards in his favor for the repayment to him of the special tax so paid, and the Commissioner certified the same for payment as follows:
“I certify that under the provisions of section 3426, Bevised Statutes of the United States, as amended by section 17 of the act of March 1,1879,1 have this day made an allowance to T. B. Dugan, first lieutenant, Third Cavalry, United States Army, in charge of post exchange at Jefferson Barracks, Mo., of twenty-five dollars ($25), being the face value, less-per centum, of a certain internal-revenue special-tax stamp.
“I further certify that the said stamj) was received at this office July 22,1897.”
“I certify that under the provisions of section 3426, Bevised Statutes of the United States, as amended by section 17 of the act of March 1, 1879, I have this day made an allowance to T. B. Dugan, first lieutenant, Third Cavalry, United States Army, in charge of x>ost exchange at Jefferson Barracks, Mo., of twenty-five dollars ($25), being the face value, less-per centum, of a certain internal-revenue special-tax stamp.
“I further certify that a claim for refunding the value of the said stamx> was received at this office July 22,1897.”
The Auditor for the Treasury Dex>artment certified the allowances for x>ayment under the decision in the case of The *465 United States v. Kaufman (96 U. S. R., 567), but tbe Acting Comptroller declined to approve Ms action and returned the claims to him with his recommendation that they be transmitted to this court for decision.
The statute under which the Commissioner made the allowances is as follows:
“The Commissioner of Internal Revenue may, upon receipt of satisfactory evidence of the facts, make allowance for or* redeem such of the stamps issued under the provisions of this title, or of any internal-revenue act, as may have been spoiled, destroyed, or rendered useless or unfit for the purpose intended, or for which the owner may have no use, or which, through mistake, may have been improperly or unnecessarily used, or where the rates or duties represented thereby have been excessive in amount, paid in error, or in any manner wrongfully collected; and such allowance or redemption shall be made either by giving other stamps in lieu of the stamp so allowed for or redeemed, or by refunding the amount or value to the owner thereof, deducting therefrom, in case of repayment, the percentage, if any, allowed to the purchaser thereof.
“ But no allowance or redemption shall be made in any case until the stamp so spoiled or rendered useless shall have been returned to the Commissioner of Internal Revenue, or until ■ satisfactory proof has been made showing the reason why the same can not be so returned.”
The decision of the Commissioner, presumably based on “satisfactory evidence of the facts,”'was that the post exchanges so established were “no longer the mere social clubs that the old post canteens were,” but that they were “brought under the complete control of the Secretary of War by the regulations as governmental agencies,” and for that reason the special tax was not requited to be paid by post exchanges as “ dealers in oleomargarine, or as- liquor dealers, or malt liquor dealers.”
There is no contention that the allowances or awards thus made were procured by fraud, or that any mistakes in mathematical calculation exist. On the contrary, the Government’s counsel insists that the decision of the Commissioner is conclusive, and therefore not open to review by either the accounting officers of the Treasury Department or the courts.
The question is, therefore, Had the Commissioner authority and power under the statute quoted to make the allowances or awards referred to ?
*466 His decision in respect of disputed questions of fact, in th<r absence of fraud or mistakes in mathematical calculation, would certainly be final and not open to review; but in the absence of disputed questions of fact, where his decision involves the construction of the law under which he acts, we think a different rule applies.
This principle or distinction was last announced by the .Supreme Court in the case of Medbury v. The United States (173 IT. S. B., 492, 497),- where, in speaking of the authority of the Secretary of the Interior under section 2 of the act of June 16, 1880 (21 Stat. L., 287), concerning the repayment of the excess of $1.25 per acre for lands sold within the limits of a railroad land grant for double the minimum price where such lands were afterwards found not to be within such grant, the court, speaking by Mr. Justice Peckham, said:
“If there were any disputed questions of fact before the Secretary his decision in regard to those matters would probably be conclusive, and would not be reviewed in any court. But where, as in this case, there is no disputed question of fact, and the decision turns exclusively upon the proper construction of the act of Congress, the decision of the Secretary refusing to make the payment is not final, and the Court of Claims has jurisdiction of such a case.’
The statute under which the Commissioner acted must be construed with reference to the exchange regulations thus promulgated by the War Department and effect given thereto to justify such awards.
True, such exchanges have not been authorized by direct legislation, but the President has the undoubted power to establish rules and regulations for the government of the Army, and whatever rules and orders are promulgated through the Secretary of War “must be received as the acts of the Executive, and as such be binding upon all within the sphere of his legal and constitutional authority,” as was held by the Supreme Court in the case of the United States-Y. JEliason (16 Peters, 291).
Furthermore, in that same case it is said: “ Such regulations can not be questioned or defied because they may be thought unwise or mistaken.”
If, therefore, in the judgment and wisdom of the Executive the establishment of such post exchanges and their manage *467 ment by tbe officers of tbe Army are essential to tbe welfare, good order, and discipline of tbe troops stationed at sucb army posts, as seems evident from tbe exchange regulations thus promulgated, then we tbink sucb exchanges, though conducted without financial liability to tbe Government, are, in their creation and management, governmental agencies, established for tbe purpose, as tbe regulations provide, of supplying “tbe troops at reasonable prices with tbe articles of ordinary use, wear, and consumption not supplied by tbe Government, and to afford them means of rational reaction and amusement,” and also, “through exchange profits, to provide tbe means for improving tbe messes.”
In other words, tbe President, looking to tbe welfare and discipline of tbe troops, sees that they need some things for “ordinary use, wear, and consumption, not supplied by the Government,” and to meet that condition tbe War Department adopts and promulgates tbe regulations whereby post-exchanges are established as tbe medium through which sucb lack may be supplied; and while sucb exchanges- so established are for tbe manifest benefit of tbe troops constituting sucb exchanges, yet there is nothing in tbe regulations looking to tbe consent of tbe members thereof as a prerequisite to their establishment. On tbe contrary, they provide that “post exchanges are established and maintained under special regulations prepared by the War Department.” And by the second paragraph thereof it is provided that “at every post, where practicable, the post commander will institute a ‘post exchange,’ and set apart, rent, or cause to be constructed a suitable building or rooms therefor, paying such rent or expense of erecting such building out of the exchange fund of which he is the custodian.
On the withdrawal of the troops from such post the exchange stock, as provided by paragraph 20 of said regulations, is to be reduced so far as possible and converted into cash and distributed equitably under the direction of the exchange council, not among the individual soldiers, but “among the organizations that are members,” and the officer in charge is required to “make a final report of the matter through military channels to the Adjutant-General of the Army.”
Thus it will be seen that the establishment, maintenance, management, and closing up of such exchanges are under the *468 control of and subject to the regulations of the War Department as governmental agencies for the purposes aforesaid.
In a recent opinion of the Attorney-General (April 3, 1899) in response to the question of the Secretary of War as to whether section 17 of the act “increasing the efficiency of the Army,” approved March 2,1899, “prohibits the continuance of the sale of beer by the Government in canteen sections of the post exchanges,” after referring to the establishment of such exchanges, the origin of the funds to operate therewith, and the character of supplies to be sold thereby, uses this language:
“All of these transactions áre carried on by the Government through the War Dopartment under a branch of the Army Regulations promulgated as post exchange regulations. Under these regulations it becomes the official duty of certain officers at the post to attend to the general direction of the business affairs of the post exchange, including all its sections, and the post commander and other officers are, of course, officially responsible for the management, discipline, and order of the whole matter.”
The Government, through its officers, by authority of the regulations, not only establishes and maintains such exchanges, but receives, handles, and disburses the funds in connection therewith, and whatever profit accrues is paid over to and held by the officer in command of such organizations as a company fund.
It has never been the policy of the Government to tax its own enterprises or its own manner or method of doing business; and inasmuch as post exchanges are established and maintained by it for the mental and physical betterment of its troops in garrisons and posts, with resulting, if not immediate, benefit to itself, we think such exchanges are exempt from the payment of special tax for the sale of such articles as the regulations permit.
If we are correct in this, then it follows that the commissioner had jurisdiction of the subject-matter of the claims for repayment, and his allowances therefore are in the nature of awards founded upon a law of Congress, and, being unim-peached, are binding under the decision in the case of United States v. Kaufman (supra), with reference to which the court said:
“It is now insisted that the finding of an allowance by the Commissioner is not enough, and that the court should have *469 gone behind the allowance and found the facts in respect of tbe original claim. Such, we think, is not the law. To say the least, the allowance of a claim under this statute is equivalent to an account stated between private parties, which is good until impeached for fraud or mistake. It is not the allowance of an ordinary claim against the Government by an ordinary accounting officer, but the adjudication by the first tribunal to which the matter must by law be submitted. Until so submitted, and until so adjudicated, there is not even a prima facie liability of the Government; but when submitted, and when allowed upon the adjudication, the liability is complete until in some appropriate form it is impeached.
This court has held in a number of cases that decisions by the Commissioner of Internal Revenue, in eases where he had jurisdiction, were binding, and that in the absence of fraud or mistakes in calculations were not subject to revision.
Such was the holding of the court in the case of Woolner’s (13 O. Gis. R., 355) and Banlc of Greencastle (15 C. 01s. R., 225), which were decisions under Revised Statutes, section 3220, being a similar statute to section 3426, and in reference to which the court in the case of United States v. Beal Estate Savings Banlc of Pittsburg (104 U. S. R., 728-731), said: “We can not discover any material difference between the powers of the Commissioner under section 3426 and those which he has under section 3220,” so that the decisions under section 3220 are equally applicable, in respect of the powers of the Commissioner, to section 3426.
Furthermore, in that same case, referring to the ruling in the Kaufmari Case (supra), the court said:
“ His payments of money in both cases must be made tnrough the accounting officers of the Treasury Department, as he is not himself a disbursing officer. Whether his allowance is conclusive on the other officers through whose hands it must necessarily pass before it can be paid by the Treasurer, we did not then, and need not now, decide. All we said then and all we say now is that, if payment is not made by reason of the refusal of any of the officers of the Department to pass or pay the claim after it has once been allowed by the Commissioner, the allowance may be used as the basis of an action against the United States in the Court of Claims, where it will be prima facie evidence of the amount that is due, and put on the Government the burden of showing fraud or mistake.
In the Banlc of Greencastle’s Case (supra), which was a case for the refund of internal-revenue tax erroneously assessed, it *470 was ruled that when an award was made by the Commissioner a new cause of action arose and that a contract to pay such award was implied.
In the Sybrandt Case (19 O. Cls. B., 461) the court held that under section 3220 the duty and responsibility of making allowances for the refund of taxes illegally or erroneously assessed rested with the Commissioner, and that the disapproval of such allowances by the Secretary of the Treasury, who had prescribed regulations requiring the Commissioner before final action to submit the case to him for his “ consideration and advisement,” did not control the Commissioner’s action or prevent him from making such allowances.
In the case of Seat, administrator of Kropp (18 C. Cls. B., 458), where an allowance had been made by the Commissioner in favor of the surety on the bond of a distiller, who had paid a judgment recovered against such distiller for a tax assessed against him, the court held that the Commissioner had no authority to make such allowance, and that therefore such allowance was without force and no action could be maintained thereon.
In the recent case of Corning <& Co. (ante p. 271), being an action to recover certain internal-revenue tax on liquors which was paid under protest, and when the Commissioner denied the application for a refund of such tax, the court said:
11 The Commissioner’s functions with respect to the matter referred to under the statute are judicial in their nature, and his action concludes a claimant from taking to the courts for investigation the things designed to be finally settled by him.”
And, furthermore, it was held that whatever rights the claimants had in that case rested upon a statute which, required the action of a revenue officer to determine, and for that reason the court refused to take jurisdiction.
In that same case, referring to the decisions in respect of the jurisdiction of the court in such cases, the court used this language:
“ The general effect of the later decisions has been to modify the construction given by the earlier cases to the exclusive power of the executive officers acting under special statutes, and to enlarge the power of the courts to deal with the subject wherever the matter at issue disclosed any of the elements of contract.”
*471 Opinion of tlie court.
In tbe case of The United States v. The American Tobacco Company (166 U. S. R., 468), affirming tbe decision of this court (32 C. Cls. R., 624), wherein tbe company bad purchased internal-revenue stamps to be put on manufactured tobacco, but which were destroyed by fire before use and tbe loss paid by tbe insurance company, and for that reason reimbursement was denied by tbe Commissioner, suit was brought and judgment recovered in this court, and in relation thereto tbe Supreme Court said:
“Tbe statute does give to tbe Commissioner of Internal Revenue tbe choice as to bow.reimbursement for tbe loss of stamps should be made — whether by delivering other stamps or by payment of the face value thereof in money. When the’ claim in this case was filed with .the Treasury Department . the Commissioner had then the choice, upon being satisfied of the necessary facts, to reimburse the claimant in either way he thought proper, either in stamp's or in money. That was the time when the election could properly have been made. Instead thereof he refused absolutely to do either, and gave ■as his reason that the claimant had already been paid for the stamps by the recovery of the insurance thereon. If that were a sufficient reason in law, the Commissioner was justified in his refusal. As it was not a sufficient reason, the Commis- , sioner was not justified, however sincerely he believed that he was. The claimant was, therefore, by reason of this refusal, compelled to resort to the courts in order to obtain his legal rights under the statute.”
Such has been the holding of the Supreme Court and this court on the question presented.
The substance or effect of them, as we understand, is this: Given a claim of which the commissioner has jurisdiction, i. e., to “make allowance for or redeem” stamps “ spoiled,destroyed, or rendered useless, or unfit for the purpose intended, or for which the owner may have no use, or which, through mistake, may have been improperly or unnecessarily used, or where the rates or duties represented thereby may have been excessive in amount, paid in error, or in any manner wrongfully collected,” his decision on the merits thereof, in the absence of fraud or mistakes in mathematical calculation, is final, and therefore not subject to revision by the accounting officers.
In the case at bar the commissioner rested his decision on the ground that “ post exchanges were under the complete control'of the Secretary of War by the regulations as govern *472 mental agencies.” Therefore, the holding in effect was that the special tax had been “wrongfully collected,” and for that reason should be refunded.
The refund of the tax so paid by the claimant undoubtedly involves the question of law as to whether the same was “wrongfully collected,” and having reached the conclusion that it was for the reasons heretofore set forth, we must hold that the claimant, as officer in charge of the exchange in the line of his official duty, for the neglect of which he would have been subject to discipline under the army regulations, was not, nor was the post exchange of which he was the officer in charge, a retail dealer in liquors within the meaning of section 18, act of March 1, 1879 (1 Supp. Eev. Stats., 229), under which the tax was imposed, and that therefore the commissioner had jurisdiction of the matter, and his allowances or awards for the refund of the taxes so paid, being unimpeached, must stand.
Upon the filing of a petition herein by the claimant, judgment will be entered in his favor for the amount of both awards, but until then the entry of judgment is hereby suspended, and in the meantime it is ordered that a copy of this opinion be certified to the Secretary of the Treasury for the information of the accounting officers thereof.
Nott, Oh. J., was prevented by illness from taking part in this case.